## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KIMBERLY LYNCH, | |
| Plaintiff, | |
| v. | |
| VILLAGE OF HAWTHORN WOODS; MAYOR JOSEPH MANCINO, in his Individual Capacity; PAMELA NEWTON, in her Individual Capacity; DONNA LOBAITO, in her Individual Capacity; Trustee NEIL MORGAN, in his Individual Capacity; Former Trustee DAVID ANSANI, in his Individual Capacity; KELLY CORRIGAN, in her Individual Capacity; and STEVE RIESS, in his Individual Capacity, | Case No. 10 C 5707 <br><br> Hon. Harry D. Leinenweber |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Before the Court are (1) Defendants' Motion for Summary Judgment, (2) Defendants' Motion to Strike Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts, and (3) Defendants' Motion to Bar Plaintiff's Recently Disclosed Witness. For the reasons stated herein, the Court grants the Motion for Summary Judgment, Denies the Motion to Strike and grants the Motion to Bar.

### I.  BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 statements of fact and supporting evidence and are undisputed unless otherwise noted.

Plaintiff Kimberly Lynch (hereinafter, "Lynch" or "Plaintiff") alleges she was demoted and then fired from her job with the Village of Hawthorn Woods in retribution for her political affiliations and her speech regarding waste of public resources in village government. She further alleges Defendants had her falsely arrested in retribution for filing this lawsuit.

Plaintiff Kimberly Lynch was appointed to the post of Hawthorn Woods Trustee in 2002 by then-Mayor Keith Hunt. Keith Hunt also had the distinction of being Plaintiff's original attorney in this lawsuit until it became clear he would be called as a witness in this case and Plaintiff secured other counsel.

Lynch served as Trustee until 2007, when Keith Hunt appointed Lynch to the full-time, paid position of Director of Parks and Recreations. Her duties included overseeing operations at the Hawthorn Woods Aquatic Center ("Aquatic Center" or the "Center") and overseeing all park and recreational activities. In the fall of 2008, Defendant Joseph Mancino ("Mancino") announced he was running for mayor on a slate of candidates challenging Keith Hunt and incumbent trustees. The slate included trustee candidates David Ansani ("Ansani"), Neil Morgan ("Morgan") and Kelly Corrigan ("Corrigan"). Keith Hunt later decided not to run for mayor again, and so Defendants dispute that Mancino "campaigned" against Keith Hunt. However, Mancino testified that he announced his candidacy before Keith Hunt stepped aside, and it was Mancino's understanding that he would be running against Keith Hunt. Defs.' L.R. 56.1

Statement of Undisputed Facts (the "SOUF"), Ex. 3, at 22-23. Lynch maintains that from 2002 to 2007, she actively supported Keith Hunt and his "Planned Preservation" slate and that Defendants were aware of this support; they deny they were. What Plaintiff means by "support" for Keith Hunt is unclear, for she admits that she "did not get involved in any campaign against" Mancino, or his slate's trustee candidates, Steve Riess ("Riess"), Corrigan and Morgan. Pl.'s Resp. to Defs.' L.R. 56.1 SOUF ¶ 40.

Mancino and his slate won the April 2009 election and took office the following month. Mancino quickly made personnel changes, such as hiring Defendant Pamela Newton ("Newton") as Chief Operating Officer, promoting village employee and Defendant Donna Lobaito ("Lobaito") to Chief Administrative Officer, and promoting village employee and Defendant Kristin Kazenas ("Kazenas") to Chief Financial Officer.

Lynch's affidavit attests that she criticized as wasteful the hiring of Newton in a spring 2009 conversation with Lobaito, which subsequently got back to Newton, who was upset about the comment and confronted Lynch about it. She also criticized as wasteful the hiring of Kazenas in a June 2009 conversation with Lobaito. Lynch did not spare Lobaito either, criticizing Lobaito and Newton's use of village credit cards in the summer or fall of 2009 in conversations with village employee Denise Kauffman, Keith Hunt and his wife Laura Hunt, and a woman named Darlene Hendrickson, village employee Jim Maiworm, former Trustee Greg Gehrke and other village residents.

- 3 -

Pl.'s L.R. 56.1 Statement of Additional Facts ("SOAF"), Ex. A, ¶ 11. In the summer and fall of 2009, Lynch criticized Newton's use of village resources (criticizing Newton's utilization of village employees to occasionally babysit her grandchildren in a portable crib at the office) to village employee Denise Kauffman, Laura and Keith Hunt, village employee Christine Lubrich, village employee Jim Maiworm, former Trustee Greg Gehrke and unnamed village "residents." *Id.* at ¶ 13.

As part of Mancino's reorganization and personnel changes, Plaintiff was demoted to Aquatic Manager on October 21, 2009. The new job was seasonal, requiring a three-month furlough from January through March, but Defendants continued year-round benefits. Immediately after being demoted, Plaintiff failed to show up for work two days in a row. Instead of calling her boss, Newton, she left a message on the voice mail of Lobaito, a fellow department head. She received an oral reprimand for failure properly to call off work.

Defendants argue they discovered other infractions for which Plaintiff arguably bore the ultimate responsibility. For instance, cash receipts at the Aquatic Center sometimes did not balance, and Plaintiff refused to obey a directive to use a police escort to transport those cash receipts, which could exceed $8,000 in a day. Furniture at the Aquatic Center was left outside for the winter, the petty cash box was not removed from the Center for the winter, and the Center was not properly cleaned and closed down for the winter. Plaintiff also failed to maintain insurance records for groups using

- 4 -

the Aquatic Center. Rental fees by groups using the Center sometimes went uncollected. New federally mandated pool grates were not installed before the furlough, although Plaintiff maintains she had a plan in place to have them installed before the pool was to open the following season. Defendants also were unhappy with how Plaintiff handled a problem with the pool's chemical feeder system, although Plaintiff insists she handled it properly. Finally, Defendants contend Plaintiff refused to provide a transition plan for her former position of Director of Parks and Recreation, claiming it was her intellectual property; Plaintiff disputes this and says she provided such a plan. Defendants fired Plaintiff in a meeting March 1, 2010 before she returned from her furlough. Plaintiff filed this lawsuit September 8, 2010.

Shortly after Plaintiff was fired, Defendants discovered that she had signed in 2007 a contract with the Ela Soccer Club ("Ela") that differed from the terms that the village board had authorized then-Mayor Keith Hunt to make and which Hunt had signed. The contract (for use of the village's soccer fields) that Plaintiff signed was more favorable to Ela by several thousand dollars over the version that Keith Hunt was authorized to make and signed. This concerned Defendants because Plaintiff had once worked for Ela. Additionally, the man who signed the contract on behalf of Ela, Tony DiJohn ("DiJohn"), had once given Plaintiff a job at another organization after Plaintiff had been forced to resign from Ela under clouded circumstances.

- 5 -

It appeared to Defendants that someone had replaced pages of the authorized contract, substituting pages with different fonts and different terms and a substituting a signature page that was signed by Plaintiff rather than Keith Hunt. For instance, the contract signed by Plaintiff had different fax-stamped dates on different pages of the contract and one page without a fax-stamped date of any sort. Plaintiff contends the discrepancies were due to back-and-forth negotiations with DiJohn; DiJohn testified he received one contract on one date without any exchange of different versions of the contract.

Keith Hunt says he cannot explain why Plaintiff's version of the contract has some pages with different fax-stamped dates and some with no fax-stamp dates at all. Keith Hunt did, however, testify that he was aware of the version Plaintiff signed, and that Plaintiff had signed it in the mistaken belief she was authorized to do so and to negotiate terms on behalf of the village. Keith Hunt informed her she did not have such authority and that the village needed to receive more money for use of its soccer fields than Plaintiff had negotiated. He signed the authorized version and, Plaintiff contends, told her someone would explain the misunderstanding to Ela.

Plaintiff testified that she signed her version of the contract in December 2007 but dated it January 22, 2008, the date the full village board would approve it. She testified that she presented her version of the contract to a village subcommittee on January 8, 2008. However, minutes from those meetings reflect the finalization of a

contract with terms consistent with the authorized contract, not Plaintiff's version.

In any event, when Mayor Mancino's administration received payments in 2010 below the authorized-contract amount, it investigated the discrepancy. Newton conferred with village board members in an executive session on April 19, 2010 to make certain the version signed by Plaintiff was unauthorized. Village records confirmed the board had not authorized the Plaintiff's version. Newton directed staff to bill Ela the authorized amount. Ela wanted the Plaintiff's version honored and asked for another meeting. The village's May 17, 2010 executive session board minutes reflect no discussion of the Ela contract situation, but Newton testified that about this time, Mayor Mancino told village officials they should begin documenting the situation if they suspected contract pages had been switched. Newton Dep., at 150 (ECF No. 91-4, PageID 518). The July 19, 2010 minutes reflect that Plaintiff had already begun making a settlement demand for what she viewed as her wrongful termination and her attorney (Michael Kralovec) had also requested certain documents under the Freedom of Information Act. *Id*. Those July minutes also reflect that Mayor Mancino had the village's attorney draft a letter to Plaintiff (dated July 20, 2010 and signed by Newton) asking for an explanation of the Ela contract. Plaintiff testified she did not respond to the July letter at the advice of her attorney, Keith Hunt. Lynch Dep., 140 (ECF No. 91-1, PageID 408).

Defendants informed the village's police chief, Jennifer Paulus ("Paulus"), of the situation in December 2010 and asked her to investigate. Paulus tried unsuccessfully to contact Plaintiff by phone, but did not try to contact Plaintiff's attorney, Keith Hunt, although the sides disagree on whether Paulus knew at that time that Keith Hunt represented Plaintiff in this civil suit.

After investigating and consulting with the Lake County State's Attorney's Office, Paulus went before a judge on June 6, 2011 and obtained an arrest warrant for Plaintiff for felony forgery.

Keith Hunt testified that Paulus then called him to inform him of the warrant and Keith Hunt then demanded to know of Paulus "Why the hell didn't you call me [before this]," particularly when, as someone involved with the contract, he might have had an explanation of why there were conflicting contracts. Ex. 15, 97 (ECF No. 91-15, PageID 700). Keith Hunt testified that Paulus responded, "Keith, I'm just doing what I was instructed to do. I'm just following orders and I'm doing what I was told." *Id*. To which Keith Hunt testified he responded, "You're the chief of police. Who the hell is telling you whether or not to charge people?" *Id*. Keith Hunt testified Paulus had no response to that question. Paulus' version of this conversation did not include such an exchange, and she testified Keith Hunt asked if she was also investigating him. The state's attorney's office dropped the charges two months after the warrant was issued.

Plaintiff sues the village, Mayor Mancino, Newton, Lobaito and Kazenas for First Amendment retaliation. (Plaintiff voluntarily dismissed counts against village trustees on July 24, 2012.) Count I alleges all Defendants demoted and terminated Plaintiff "because of her political support for the opposition slate and the prior administration, as well as for her exercise of free speech regarding waste and wrongdoing in Village government." First Amended Complaint ("FAC"), at 9.

Count II is a § 1983 False Arrest claim alleging "Defendants, through the Village's police officers, arrested Lynch without probable cause and/or reasonable grounds to believe that she committed the charged forgery offenses" in retaliation for her lawsuit. FAC, at 11.

Count III alleges "False Arrest Under Illinois Law."

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when the evidence shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Brewer v. Bd. of Trs.*, 479 F.3d 908, 915-916 (7th Cir. 2007). There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party. *Id.*

## III. <u>ANALYSIS</u>

### A. Motion to Bar Plaintiff's Recently Disclosed Witness

Because the Court must know whether it should consider the evidence of witness Laura Hunt in deciding the Motion for Summary

Judgment, it deals first with Defendants' Motion to Bar Plaintiff's Recently Disclosed Witness.

This case was filed on September 8, 2010. Almost a year later, on August 11, 2011, Judge William J. Hibbler set a discovery schedule (by agreement of the parties) closing written discovery on October 14, 2011 and oral discovery on January 31, 2012. Defendants on January 20, 2012 filed an Agreed Motion to Extend the Close of Discovery to April 2, 2012. In Judge Hibbler's absence, Judge Amy St. Eve granted the motion on February 2, 2012. On March 14, 2012, citing the switch of law firms by Defendants' counsel, Defendants filed an Agreed Motion Requesting an Additional 60 days of discovery. Judge St. Eve granted that motion on March 15, 2012, extending the close of discovery to June 1, 2012. On March 31, 2012, this case was reassigned to this Court.

Defendants' counsel, Dominick Lanzito ("Lanzito"), subpoenaed Keith Hunt on December 23, 2011 for a January 12, 2012 deposition date. On the same day, Keith Hunt responded to Lanzito that he could not attend a deposition on January 12, 2012. Defendants' counsel on December 28, 2011 invited Mr. Hunt to suggest a date convenient for him. Mr. Hunt responded on the same day – not with a date but with an inquiry as to when discovery closed. Lanzito responded the same day, asking for Keith Hunt's dates of availability and encouraging him to at least respond to written discovery immediately. On April 2, 2012, Lanzito again e-mailed Keith Hunt, prodding him for

depositions dates.  On the same day, Keith Hunt requested another copy of the subpoena via e-mail.  The same day, Lanzito provided it.

On May 4, 2012, still with no response from Keith Hunt, Defendants filed a Motion for a Rule to Show Cause against Keith Hunt.  When the parties appeared on the motion on May 10, 2012, they indicated Keith Hunt had agreed to sit for his deposition on June 5, 2012.  This Court agreed to extend discovery past the June 1, 2012 deadline for the limited purpose of obtaining written and oral discovery from Keith Hunt.  Mr. Hunt was deposed on June 5, 2012, and on June 14, Defendants withdrew their motion for a rule to show cause.

Defendants' Motion for Summary Judgment, at that point, was due August 9, 2012.  On August 7, 2012, Defendants filed an agreed motion to extend that deadline to August 17, with a response due September 14, 2012 and a reply due September 28, 2012.  The Court approved that schedule on August 22, 2012.  Plaintiff three times (on agreed motions) extended her response date, first to September 28, 2012, then to October 5, 2012 and then again to October 12, 2012.  The Court approved these requests.

On October 1, four months after the close of discovery and several weeks after Defendants submitted their Motion for Summary Judgment, Plaintiff provided Defendants with her First Supplemental Disclosures.  They indicated for the first time that Keith Hunt's wife, Laura Hunt, was a witness likely to have discoverable information regarding Plaintiff's allegations.  On the very next day,

Defendants filed a Motion to Bar Laura Hunt's testimony. Plaintiff attached an affidavit from Laura Hunt and printouts of cell phone texts between her and village employee Denise Kauffman ("Kauffman") in which Kauffman complained about the ethical improprieties of Defendants' actions.

Defendants argue that Laura Hunt's affidavit and texts would severely prejudice them, particularly since the disclosure came after their Motion for Summary Judgment was filed and because they have not had a chance to depose Laura Hunt.

Plaintiff's response to this is she did not know until "late September" that Laura Hunt possessed the Kauffman texts, at which point she "immediately" requested all text messages. Pl.'s Resp. to Mot. to Strike, 3. She also avers that she offered Defendants the opportunity to depose Laura Hunt before filing their Reply, but that Defendants elected to stand on their Motion to Strike. *Id.*

As Plaintiff acknowledges, "[t]o bar this information [Hunt's affidavit and the texts she supplied] . . . could result in relevant facts that are pertinent to Plaintiff's case from reaching a jury." *Id.*

"The decision to admit previously undisclosed testimony is entrusted to the broad discretion of the court." *Keach v. U.S. Trust Co.*, 419 F.3d 626, 640 (7th Cir. 2005). While explicit findings regarding existence of a substantial justification or harmlessness are not required, the Court's discretion should be guided by (1) the prejudice or surprise to the party against whom evidence is offered;

- 12 -

(2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial (or in this case, motion for summary judgment); and (4) the bad faith or willfulness involved in not disclosing the witness earlier. *Id.*

In light of these considerations, the Court agrees with Defendants. Plaintiff essentially claims that her justification is that she only recently found out about the witness Laura Hunt and her evidence. The Court does not find this excuse a substantial justification, particularly when three judges have extended discovery and motion deadlines.

Nor would the admission be harmless and without prejudice. Defendants had already structured their Motion for Summary Judgment, in part, around a contention that Plaintiff could not demonstrate communicating any protected speech; Laura Hunt's affidavit goes directly to this point, recounting instances where Plaintiff communicated complaints about village officials' wasteful spending. Defendants could be allowed to take more deposition evidence to counter the prejudice, but this would only create more delay and cost for them. Additionally, Plaintiff would thus be allowed to preview Defendants' summary judgment strategy without penalty.

Plaintiff never really explains why she could not have made inquiries of Laura Hunt earlier. Laura Hunt was, in fact, the spouse of Plaintiff's original counsel, Keith Hunt, who himself lollygagged in sitting for his deposition. Such inquiry of Laura Hunt would have been as simple for former counsel as a chitchat over morning coffee.

Even discounting former counsel's spousal relationship with the witness at issue, current counsel for Plaintiff could have investigated this avenue much sooner than they did, and there is no explanation offered for why they did not.

Without limitations on discovery, lawyers could always find one more witness, one more e-mail, one more piece of evidence to bolster their case. That is not the significant challenge of litigation; the significant challenge is doing it within the prescribed time period, and such time periods are prescribed so that justice is not indefinitely delayed, and so cases come to a resolution in a timely manner. *See Spears v. City of Indianapolis*, 74 F.3d 153, 158 (7th Cir. 1996) (characterizing trial practice delay as a detriment to both the parties involved and the judicial system in general.)

Plaintiff has not explained why she is substantially justified in not making inquiries of Laura Hunt earlier. There has been enough delay in this case already. Laura Hunt's affidavit, as well as the associated texts, are stricken for purposes of the Motion for Summary Judgment.

## B. Motion to Strike Plaintiff's Local Rule 56.1 Statements of Additional Facts

Defendants argue that the compound statements and sentences of Plaintiff's statements of additional fact have resulted in more than the 40 allowed statements of additional fact. Therefore, they argue, all of Plaintiff's additional facts should be stricken. *See* L.R. 56.1(b)(3)(C).

The Court agrees with Plaintiff that Defendants are a pot calling a kettle black, as many of their own statements are compound as well. If statements are to be stricken, Plaintiff contends, Defendants' statements of fact should also be stricken.

In some particularly verbose violations of Local Rule 56.1, this Court has seen fit to throw the whole summary judgment process back to the parties to try again. *See, generally, Widmar v. Sun Chem. Corp.*, No. 11-1818, 2012 U.S. Dist. LEXIS 148684 (N.D. Ill. Oct. 16, 2012) (J. Leinenweber). However, in this instance, neither party has been so overly effusive as to merit that correction. Additionally, the Court, as noted above, does not want any more delay. The Court denies the motion.

## C. Defendants' Motion for Summary Judgment

### 1. First Amendment Retaliation

To establish a *prima facie* case of First Amendment retaliation, Plaintiff must present evidence that: (1) her speech was constitutionally protected; (2) she has suffered a deprivation likely to deter free speech; and (3) her speech was a motivating factor in the employer's decision. *Redd v. Nolan*, 663 F.3d 287, 294 (7th Cir. 2011). For the purposes of their summary judgment motion, Defendants have conceded the first two elements. Defs.' Mem. 5. All that remains to be determined in regards to whether a *prima facie* case exists is determining whether Plaintiff has presented evidence that could allow a jury to conclude that her speech was a motivating

factor in the Defendants' decision to engage in actions that could constitute a deprivation likely to deter free speech (*i.e.,* causation).

Here, Plaintiff claims there were two retaliations constituting a deprivation. They are her demotion and subsequent firing, which she contends were motivated by (1) her political support of Mayor Mancino's opponent and predecessor, Keith Hunt and (2) her speaking out against financial waste and mismanagement of the Mancino administration.

Defendants respond that there is little to no evidence showing that political support or complaints about Mancino were ever communicated or demonstrated to Defendants, and for that reason, no causation can be shown. What evidence there is, Defendants say, comes in the form of Plaintiff's affidavit. They argue this affidavit is contradictory to Plaintiff's deposition and thus should be disregarded as a "sham" affidavit. *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir. 1993); *Truly v. Sheahan*, 135 Fed.Appx. 869, 871 (7th Cir. 2005). For instance, Defendants argue that Plaintiff's affidavit attests that she criticized Defendants (such as Newton) to Defendant Lobaito, but this is contradicted by her deposition testimony that she "never criticized or voiced any criticisms directly to Donna Lobaito." Defs.' Reply, at 4. This misstates the deposition testimony. Plaintiff did, in fact, testify that she never criticized any Defendant directly to that Defendant. However, she also testified that she criticized Defendants to Lobaito

and others.  Ex. 1, at 86 (ECF 91-1, PageID 395).  Therefore, this portion of the affidavit is not in conflict with the testimony and will not be disregarded.

However, Defendants are correct that "self-serving affidavits *without factual support in the record* will not defeat a motion for summary judgment." *Broaddus v. Shields*, 665 F.3d 846, 856 (7th Cir. 2011).  "Rule 56 demands something more specific than *the bald assertion of the general truth of a particular matter*; rather it requires affidavits *that cite specific facts establishing the existence of the truth of the matter asserted*." *Drake v. Minnesota mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (emphasis added).

To that end, Plaintiff's affidavit makes the "bald assertion" that Defendants "knew I had been a supporter of Mayor Hunt." Ex. A, at 3 (ECF No. 108-1).  The only factual support for this is Plaintiff's affidavit assertion that "I was the only Village employee from the Hunt administration who also had served as a Trustee and campaigned as a part of Hunt's slate." *Id.*  Since Plaintiff already admitted she did not campaign against Mancino, this must refer to prior elections.  None of these statements by Plaintiff relate any specific facts that would indicate Defendants knew this, and so the Court disregards it as conclusory.

Even if the Court were to pay it heed and accept that Defendants knew of Plaintiff's political affiliations, "a difference in political affiliation alone is not enough to show improper

motivation." *Rakovich v. Wade*, 850 F.2d 1180, 1191 (7th Cir. 1988). Additionally, "evidence of disagreement or dislike must be accompanied by evidence linking it to the injury. More than mere speculation must serve as the basis for finding that such disagreement is the 'motivating cause.'" *Id.* "The bare allegation that [a Plaintiff] supported [a Defendant's] opponent in an election will not suffice." *Id.* at 1193.

Here, Plaintiff has presented no evidence to suggest that political affiliation played a role in her demotion or dismissal and has not shown causation as to that allegation. She attempts to show the animosity between Mayor Mancino and former Mayor Keith Hunt with testimony that Mancino made a rude gesture with his middle finger, but this (1) is part of the disallowed Laura Hunt evidence and (2) demonstrates only animosity toward Keith Hunt, not Plaintiff. She also argues that Newton bumped heads with Keith Hunt as a county official when the two disagreed on local water plans. In addition to being long-removed from the complained of conduct, "[a]ny finding of a genesis of the complaint of conduct in such stale and general disagreements would only be the result of mere speculation." *Id.* at 1193. Plaintiff's First Amendment action on the basis of political affiliation fails.

As to the allegation that Defendants retaliated for Plaintiff's complaints about spending and mismanagement, Plaintiff cites two instances showing a Defendant heard about Plaintiff's protected speech: Plaintiff's spring complaint to Lobaito about the hiring of

Newton and Plaintiff's June complaint to Lobaito about the promotion of Kazenas.

Plaintiff's affidavit states that Lobaito relayed the complaint about Newton's hiring to Newton, and that Newton was upset about the comment and confronted her about it. Defendants argue this conflicts with prior testimony that Plaintiff gave that she never directly discussed with Newton complaints regarding Newton's job performance, or that Plaintiff had never mentioned to Newton Plaintiff's political affiliation. While Plaintiff's affidavit remembrance is certainly convenient, it does not clearly conflict with her prior deposition testimony; criticizing Newton's hiring and criticizing her performance are two different issues, and so this confrontation with Newton will not be disregarded under the "sham affidavit" rule. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170-71 (noting that affidavit facts must be squarely and clearly contradictory to deposition facts to be disregarded).

Nonetheless, the existence of this evidence does not win the day for Plaintiff. The comment about Newton came "in the spring of 2009" (Ex. A, 3, ECF 108-1, PageID 883) and Newton confronted Plaintiff about it "just a few days later." Pl.'s Resp., at 8. Plaintiff was not demoted until October 2009 and was not fired until March 2010. Generously assuming the confrontation happened on the last day of spring, June 20, 2009, that means the criticism occurred four months prior to Plaintiff's demotion, the same time (June) at which Plaintiff made her comment about Kazenas' hiring. These comments are

- 19 -

too far removed from the adverse employment action to establish a retaliatory motive. *See Agyropoulos v. City of Alton*, 539 F.3d 724, 736-737 (7th Cir. 2008) (finding seven weeks between the alleged free speech and termination insufficient to establish retaliatory motive) (citing *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005).

Plaintiff argues that Defendants' reasons for termination were pretextual, citing *Valentino v. S. Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009). But that puts the cart before the horse. As *Valentino* itself notes, only *after* Plaintiff demonstrates a *prima facie* case does the inquiry shift to whether the alleged reason for firing was pretextual. *Id.* at 670 ("*If a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech.*") (emphasis added). Here, unlike *Valentino*, Plaintiff has not established a *prima facie* case because there is no evidence of causation.

Summary Judgment for the First Amendment Retaliation claim is granted.

### *2. False Arrest*

Plaintiff argues that the arrest was a violation of her Fourth Amendment rights because it came without probable cause.

"Probable cause is an absolute defense to a claim of unlawful arrest in violation of the Fourth Amendment." *Brooks v. City of Aurora*, 653 F.3d 478, 483 (7th Cir. 2011) (internal punctuation

omitted.)   Probable cause is to be determined in a practical, nontechnical manner.   *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989).   The inquiry raises questions of probabilities and the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.   *Id*.   Probable cause requires more than a bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.   *Id.*

Plaintiff contends that because the charges were dropped by the state's attorney's office, there is necessarily a question of fact as to whether there was probable cause.   She cites *Quinn v. Cain*, 714 F.Supp. 938, 941 (N.D. Ill. 1989).   This Court disagrees that *Quinn* stands for that proposition.   *Quinn* took place against the backdrop of disputed facts as to what occurred at the scene of the arrest. *Id*.   It merely ruled that in the face of such disputed facts, where there was no conviction for battery, the court could not assume that a conviction for resisting arrest translated into probable cause for a battery charge.   *Id*.

Contrary to Plaintiff's contention, courts have found summary judgment appropriate even when charges were dropped.   *See Nelson v. Vill. of Lisle*, 437 Fed.Appx. 490, 493-494 (7th Cir. 2011) (sustaining summary judgment even after charges were dropped when undisputed facts showed that arresting officer was in possession of facts giving her probable cause to arrest).

Here, the parties do not dispute that Defendants and Chief Paulus tried to contact Plaintiff at least twice before seeking an arrest warrant. Newton sent Plaintiff a July letter seeking an explanation for the two contracts, and Plaintiff admits that she received at least one phone call from Chief Paulus seeking an explanation. Plaintiff, as is her right under the Fifth Amendment, never responded to those requests upon advice of counsel.

It is also undisputed that Plaintiff had no authority to sign the soccer field contract. It is undisputed that Chief Paulus had in her possession both versions of the contract and that Plaintiff's version appeared to have pages in different fonts and with different or missing fax-stamped dates, suggesting those pages had been switched out. It is undisputed that the state's attorney suggested what charges to lodge, and that a judge approved the arrest warrant (indicating that the judge, too, found probable cause). The Court therefore finds probable cause existed to arrest Plaintiff.

Plaintiff's main argument that no probable cause exists centers around the fact that Chief Paulus never spoke to Plaintiff or tried to call her attorney, Keith Hunt, in the course of her investigation. This ignores the fact that Defendants and Paulus tried to contact Plaintiff. Certainly, a call to Keith Hunt to ask the former mayor what he knew of the situation would have been a more thorough investigation. "Yet police need not investigate every potentially exculpatory detail. Once there is probable cause, pre-arrest investigation may cease." *Nelson*, 437 Fed.Appx. at 494.

- 22 -

Plaintiff points to Keith Hunt's testimony that when Keith Hunt asked Chief Paulus why she had not called him in the course of the investigation, she replied she was simply following orders. Taking this in the light most favorable to Plaintiff, it implies Defendants had told her not to contact Hunt. There are a myriad of reasons of why this might be so (including that Keith Hunt may have been a suspect). None of them dispels the reality that Chief Paulus was not required to contact Keith Hunt and that she had probable cause to arrest. The Court thus grants summary judgment on Counts II and III.

## IV.  CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment on all counts is granted.


**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 1/31/2013